FILED

JUL 1 6 2012

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN DOUGLAS BURR,<br><br>　　　　Petitioner,<br><br>　vs.<br><br>FRANK CHAVEZ, Warden,<br><br>　　　　Respondent. | No. C 10-5935 LHK (PR)<br><br>ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY |

Petitioner, a state prisoner proceeding *pro se*, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The Court ordered Respondent to show cause why the petition should not be granted. Respondent has filed an answer addressing the merits of the petition. Petitioner has filed a traverse. Having reviewed the briefs and the underlying record, the Court concludes that Petitioner is not entitled to relief based on the claims presented and denies the petition.

**PROCEDURAL HISTORY**

Petitioner was sentenced to fifteen years-to-life in state prison after his conviction for second degree murder in Contra Costa County Superior Court. Petitioner filed a direct appeal to the California Court of Appeal, which affirmed the conviction and judgment, and a subsequent petition for review in the California Supreme Court, which denied the petition. Petitioner did not file any state habeas petitions. The instant federal habeas action was filed on December 28,

2010.

## BACKGROUND[1]

Defendant met the victim, Diana Besham, in the summer of 2001, and by 2005 the two had married. According to defendant's testimony, although their marriage started out well enough, the couple quickly encountered financial problems and Besham seemed to lose interest in defendant. Early in 2006, defendant began to suspect that Besham was cheating on him with her ex-husband. This led to a series of escalating verbal disputes, in one instance causing neighbors to call the police. Both defendant and Besham were heavy drinkers, and their arguments were often fueled by alcohol.

On the way home from a baseball game on June 16, 2006, defendant confronted Besham with his suspicions. The two had been drinking, and the argument became so intense that defendant drove to the home of Besham's ex-husband intending to leave her there. When defendant got out of the truck to open the door for Besham, she slid to the driver's seat and started driving away. Defendant held on, yelling for Besham to stop, and was dragged along the pavement until he slipped and fell to the ground. Defendant was taken to the hospital and treated for a broken finger, a broken tooth and a bloody nose.

The next day the couple discussed separating, but ultimately agreed to see a counselor and to stop drinking alcohol. They continued to have problems, however, and defendant began to think that Besham might order him out of their apartment. On Saturday, June 24, defendant learned that Besham planned to go to a bar with her friends, and the two began arguing. The police were eventually called, and they both agreed to go to bed in the separate bedrooms in which they were then sleeping.

The next morning, the couple reconciled. Defendant went to a baseball game, and Besham went to a car show with her friends. After returning home from the game, defendant started drinking. He learned that Besham was at a bar with her friends, and after a few hours home alone, he spoke to her on the phone about joining them. Besham told defendant that this was not a good idea because none of his friends were there, but he nonetheless went to the bar, where he joined Besham, who was sitting with two of her girlfriends and a man. Their table was full of beer bottles and shot glasses. Already curious, defendant became suspicious when Besham and one of her friends repeatedly went to the bathroom together. At some point, defendant heard Besham's cell phone ring and he grabbed her purse and went outside to see who was calling. Besham followed, retrieved her purse and went back inside. The two began to argue. Friends separated them, and Besham left the bar with her friends.

About 45 minutes later, defendant went home, but Besham was not there. He continued drinking until Besham returned with a friend, and after the friend left the two began to argue. As the argument escalated, Besham went into the kitchen. Defendant followed her and found Besham facing him with a knife in one hand and phone in the other. He pushed her, grabbed the knife and put it away. Defendant then followed Besham upstairs, each screaming at the other. Besham entered one of the bedrooms and grabbed a phone. Defendant tried to

---

[1] The facts of this case are taken from the California Court of Appeal opinion in *People v. Burr*, No. A123229 (Cal. App. 1 Dist. Jul. 15, 2010). (Ans. Ex. E ("Op").)

take the phone from her, and the two fought. Then they both sat on the bed and continued arguing. Defendant began to feel his "skin getting hot." He grabbed Besham by the neck, and the two fell to the ground, fighting.

At some point defendant got up, grabbed a trophy that was in the room and struck Besham with it two or three times, killing her. Defendant testified that he then "snapped out of the state of mind" he was in. Realizing what he had done, he started crying, went to the garage to get razor blades, returned upstairs, lay down next to Besham's body and began cutting his wrists. Defendant soon passed out, and when he regained consciousness he called the police, unlocked the front door, returned upstairs and again began cutting his wrists. According to defendant, he was not thinking about killing his wife when he hit her with the trophy; he testified that he was not thinking at all. He could not believe what he had done, and wanted to kill himself so that he could "be with her forever."

Police and forensic testimony generally confirmed defendant's account of events. Besham died either of blunt force trauma or asphyxiation. Defendant was charged by information with murder. (*Pen. Code, § 187.*) At trial, defense counsel argued that defendant had acted under the heat of passion, reducing the crime to voluntary manslaughter. The jury found defendant guilty of second degree murder, and the court sentenced him to 15 years to life imprisonment. Defendant filed a timely notice of appeal.

(Op. at 1-3.)

## DISCUSSION

A.    <u>Standard of Review</u>

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 384-86 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if the state court correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.

In determining whether the state court's decision is contrary to, or involved an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of a Petitioner's claim in a reasoned decision. *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000). Here, that decision is the opinion of the California Court of Appeal.

B.  Petitioner's Claims

Petitioner claims the following as grounds for federal habeas relief: (1) his counsel rendered ineffective assistance by failing to object to the prosecutor's misstatements during closing argument; and (2) the trial court's policy of conducting a readback in a closed jury room violated Petitioner's right to counsel, right to be present, right to a public trial, and right to procedural due process.

   1.  Ineffective Assistance of Counsel

Petitioner's first claim is that his counsel rendered ineffective assistance by failing to object to the prosecutor's misstatements during closing argument.

The prosecution explained the concept of voluntary manslaughter during his closing argument as follows.

> So what circumstances gets rid of malice aforethought? There is [*sic*]
> two ways:

> One, imperfect self-defense. That is where defendant actually but unreasonably believed he needed to defend himself.
>
> And, two, heat of passion. So there is [sic] two ways to excuse murder and to make it voluntary manslaughter, imperfect self-defendant and heat of passion. This is what is needed to show that this was a heat of passion. The defendant must have been so overcome by passion that the defendant acted rashly without thinking. It's not just enough to know that the defendant was enraged or that he acted under passion, it has to be so overcome by emotion that you are not thinking.
>
> Because every murder just about, there is rage behind it. Rage alone isn't enough to excuse a murder, to reduce it to a voluntary manslaughter.
>
> A reasonable person would have been provoked.
>
> So as the judge was instructing, sufficient provocation. Sufficient provocation means the probable person under those – the same circumstances would have been provoked.
>
> And, three, the reasonable person would have responded the same way. So [a] reasonable person in the defendant's situation would have been provoked, and would have responded the same way. The two ways to excuse murder and to make it a voluntary manslaughter.

(Reporter's Transcript ("RT") 565-566; Ans. Ex. H.)

The prosecutor stated the following after discussing imperfect self-defense.

> Heat of passion. That doesn't work either to excuse murder. To reduce murder to voluntary manslaughter. Why? There is insufficient provocation. And let's think about it, what is the provocation? What is it that the defendant said he and [Ms. Besham] were fighting about when he was on the stand on Thursday? What did the defendant say the fight was about? He said he didn't remember what the fight was about. How could there be sufficient provocation? The fight, he can't even remember what the fight was about, yet he wants this jury to believe that whatever the fight was about was sufficient to reduce a murder to manslaughter. Defendant didn't even tell us what the fight was about. Yet we do know that the defendant was angry. He was angry earlier, angry that [Ms. Besham] wouldn't let him see her cell phone. Is that sufficient provocation? The fact that Diana would not let the defendant see her cell phone? No, it's not sufficient provocation.
>
> What about the fact that [Ms. Besham] told the defendant to leave, to move out a day and a half earlier? Is that sufficient provocation that she wants to end the marriage? No, it's not.
>
> [¶]...[¶]
>
> There was no heat of passion because the defendant's reaction was incredibly unreasonable. The severity of the beating was incredibly unreasonable for a fight the defendant can't even remember what the fight is about.

1 |       And lastly the defendant was not completely overcome by passion. The defendant shows that he was thinking when he took the knife away from [Ms. Besham]. When he pursued [Ms. Besham] to the bedroom. When he used different methods, the defendant had to stop strangling her and start hitting her. Stop hitting her and start strangling her. And the defendant had to decide to get the trophy or trophies and use it, or them as weapons. There is no heat of passion in this case.

(RT 569-571.)

    Then during rebuttal argument, the prosecution again emphasized the degree of provocation that was necessary for a heat of passion defense.

      Defense counsel argued that this situation between Mr. Burr and Ms. Besham, this is the definition of manslaughter. It's not the definition of manslaughter. The Court gave you the definition of manslaughter. If you were to follow defense counsel's argument, then every time a marriage became rocky, every time a husband got mad at a wife, every time a wife got mad at a husband and acted on that, well then, that would be manslaughter. But that's not the definition of manslaughter.

      [¶]...[¶]

      Now, heat of passion, I talked about it, it is not just acting on rage. Rage alone is not enough to excuse a murder, to downgrade a murder to a manslaughter, that you have to be acting on more than rage, that you have to be not thinking. But defense counsel said I was wrong, and then he went into the definition of you have to be overcome by rage and acting on that rage. That is essentially the same thing, you're not thinking, you're acting on the rage. But defense counsel admitted and the defense counsel admitted that he – that the defendant wanted to hurt Ms. Besham. When the defendant was in the room upstairs beating her, he wanted to hurt Ms. Besham. That is a decision. That is acting on more than just rage.

      Heat of passion isn't just provocation. A person just can't come to court and say I was provoked, now it's manslaughter. And the definition could be that a defendant is not permitted to set up his own standard of conduct and to justify or excuse himself because his passions were aroused unless the circumstances in which the defendant was placed and the facts that confronted the defendant were such as would have aroused the passion of an ordinarily reasonable person states [*sic*] with the same situation. The defendant is not allowed to set up his own standard of conduct. It has to be reasonable. A reasonable person wouldn't have been provoked.

(RT 601-604.)

    The California Court of Appeal rejected this claim after finding that although the prosecution did make misstatements, they were insignificant and gave rise to no prejudice.

      Defendant asserts that the prosecutor erroneously told the jury that it could convict defendant of voluntary manslaughter on a heat of passion only if it found that the victim's conduct would provoke a reasonable person to react in

the same manner as defendant had reacted. In discussing the elements of voluntary manslaughter, the prosecutor stated that in order to reduce a killing to voluntary manslaughter it must be shown that "the reasonable person would have responded the same way. So a reasonable person in the defendant's situation would have been provoked, and would have responded in the same way." [footnote omitted.] The prosecutor also argued that "[t]here was no heat of passion because the defendant's reaction was incredibly unreasonable. The severity of that beating was incredibly unreasonable [where] the defendant can't even remember what the fight is about." [footnote omitted.] Defendant also asserts in his appellate brief that the prosecutor told the jury that "the requisite mental state for heat of passion was a lack of all thinking whatsoever." The prosecutor did tell the jury that "It's not just enough to know that the defendant was enraged or that he acted under passion, it has to be so overcome by that emotion that you are not thinking," and that "[w]hen the defendant was in the room upstairs beating her, he wanted to hurt Ms. Besham. That is a decision. That is acting on more than just rage."

It is of course improper for a prosecutor to misstate the law. (*People v. Hill* (1998) 17 Cal.4th 800, 829-830.) Nonetheless, "closing arguments of counsel... are seldom carefully constructed... [and] improvisation frequently results in syntax left imperfect and meaning less than crystal clear." (*Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 646-647.) As a result, the court will not lightly assume that ambiguous remarks by a prosecutor are intentional misstatements of the controlling law. (See *People v. Howard* (1992) 1 Cal.4th 1132, 1192.)

To the extent the prosecutor suggested that defendant could be found guilty of voluntary manslaughter only if the jury found that under the circumstances a reasonable person would have killed Besham, this argument misstated the law. Voluntary manslaughter is the "unlawful killing of a human being without malice... upon a sudden quarrel or heat of passion." (Pen. Code, § 192, subd. (a).) A conviction for voluntary manslaughter is appropriate if the victim has provoked the defendant in a manner causing "'the reason of the accused [to be] obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.'" (*People v. Barton* (1995) 12 Cal.4th 186, 201.) The focus of the inquiry is not the reasonableness of defendant's behavior under the circumstances – most homicides are unreasonable, no matter how committed. The proper question is whether the defendant was provoked by circumstances "'sufficient to cause an "'ordinary [person] of average disposition... to act rashly or without due deliberation and reflection, and from this passion rather than from judgment,'"'" thus negating the malice aforethought required for a murder conviction. (*People v. Carasi* (2008) 44 Cal.4th 1263, 1306; *People v. Johnston* (2003) 113 Cal.App.4th 1299, 1311.)

[¶]...[¶]

Although the prosecutor's statement that a killing cannot be manslaughter unless a "reasonable person would have responded the same way" was incorrect, the principal thrust of the prosecutor's argument was entirely proper. Much of her argument was devoted to negating imperfect self-defense as a basis for reducing the crime to voluntary manslaughter, and to arguing that there was deliberation and premeditation justifying a verdict of first degree rather than second degree murder. As to the possibility of voluntary

manslaughter on the ground of a sudden quarrel or heat of passion, the thrust of her argument was that defendant "was not completely overcome by passion" and that a "reasonable person wouldn't have been provoked." [footnote omitted.] Never did the prosecutor urge the jury to reject voluntary manslaughter because it was not reasonable to have killed the victim. Defendant had testified that he could not remember what he and Besham were arguing about immediately before he struck her, and as the Attorney General asserts, the prosecutor's statement that "the severity of the beating was incredibly unreasonable" was made in the context of her contention that a reasonable person would not be sufficiently provoked by an argument the subject of which he could not remember.

Nor did the prosecutor's argument suggest, as defendant now argues, that one must "be completely devoid of thought altogether" to warrant a finding of voluntary manslaughter. During rebuttal, the prosecutor qualified her earlier assertion that "[i]t's not just enough to know that the defendant was enraged or that he acted under passion, it has to be so overcome by that emotion that you are not thinking," stating: "[D]efense counsel said I was wrong, and then he went into the definition of you have to be overcome by rage and acting on that rage. *That is essentially the same thing, you're not thinking, you're acting on the rage.*" [footnote omitted.] Similarly, the prosecutor's argument that "[w]hen the defendant was in the room upstairs beating her, he wanted to hurt Ms. Besham. That is a decision. That is acting on more than just rage," did not suggest, as defendant now contends, that he could not be convicted of manslaughter if he intended to harm Besham. (See *People v. Lasko* (2000) 23 Cal.4th 101, 107, 111.) Not only did the prosecutor explicitly tell the jury that this is not the law, but her words can be fairly understood as arguing that defendant's professed desire to hurt his wife provided evidentiary support for the conclusion that he was not reasonably provoked to a point where he was acting without reason. (See *Donnelly v. DeChristoforo, supra,* 416 U.S. at p. 647; *People v. Howard, supra,* 1 Cal.4th at p. 1192.)

Placed in context, the single passing inaccuracy in the prosecutor's argument caused no prejudice. In his closing argument, defense counsel corrected any implication that defendant could not be convicted of voluntary manslaughter unless it found that a reasonable person would have killed the victim. Defendant's attorney argued, "The question is whether or not the provocation existed, whether or not he was engaged in the heat of passion... when he committed this act and killed his wife. [¶]... "[T]he definition of manslaughter is when you are doing it as a result of provocation and as a result of this heated battle between [you] and someone else." In her closing reply, the prosecutor did not respond by suggesting that to return a verdict of voluntary manslaughter the jury must also find that the killing itself was reasonable. In all events, defendant does not question the accuracy of the court's instruction defining voluntary manslaughter using CALJIC No. 8.42. [FN5] The court twice directed the jury to follow its instructions if arguments made by the attorneys conflicted with those instructions. In the absence of any evidence to the contrary – and there is none [FN6] – we presume that the jury followed the court's instructions. (*People v. Najera, supra,* 138 Cal.App.4th at p. 224; see also *People v. Boyette* (2002) 29 Cal.4th 381, 436.)

> FN5. The court instructed in part: "To reduce an unlawful killing from murder to manslaughter upon the ground of sudden quarrel or heat of passion, the provocation must be of the character and degree as naturally would excite and arouse the passion, and the assailant must act under the

> influence of that sudden quarrel or heat of passion. [¶] The heat of passion which will reduce a homicide to manslaughter must be such a passion as naturally would arouse in the mind of an ordinarily reasonable person in the same circumstances. A defendant is not permitted to set up its own standard of conduct and to justify or excuse himself because his passions were aroused unless the circumstances in which the defendant was placed and the facts that confronted him were such as also would have aroused the passions of the ordinarily reasonable person faced with the same situation. Legally adequate provocation may occur in a short, or over a considerable period of time. [¶] The question to be answered is whether or not at the time of the killing the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from passion rather than from judgment." The court also modified a portion of the voluntary manslaughter instruction in CALCRIM No. 570, to add, "Heat of passion does not require anger or rage. It can be any violent, intense, high-wrought or enthusiastic emotion." This is an accurate statement of the law. (*People v. Barton, supra*, 12 Cal.4th at p. 201.)
>
>> FN6. To the contrary, during deliberations the jury requested and received three additional copies of the court's instructions, suggesting that it was following those instructions.
>
> Thus, there are at least two reasons for rejecting defendant's contention that he was denied effective assistance of counsel. First, the inaccuracy in the prosecutor's argument was marginal and counsel may reasonably have believed that correcting the misstatement in his own argument would be more effective than interrupting the prosecutor's argument with an objection. Shortly before the point at which defendant argues his attorney should have objected, the attorney did object to a statement by the prosecutor on the ground that it misstated the law. The objection prompted the court to instruct the jury a second time that the court's instructions which they would receive in writing "are the actual legal instructions that apply to this case and control your deliberations. Counsel are permitted to argue how they believe those instructions should be applied to this case, and in the way of explaining them they may use different language, but it's the language that I give you that controls. But the objection otherwise is overruled." Moments later, counsel may well have been reluctant to appear obstreperous by asserting that another statement by the prosecutor also misstated the law. On this record we cannot say that any reasonable attorney would have interposed an objection at that point in the prosecutor's argument. (See *People v. Jones* (2003) 30 Cal.4th 1084, 1105 ["defendant must show that counsel's actions or inaction was not a reasonable tactical choice"].) And, secondly, even if counsel should have objected, the jury was properly instructed on the correct standard, eliminating any possible prejudice from the failure to object. [footnote omitted.]

(Op. at 4-10.)

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, Petitioner must establish two things. First, he must establish that counsel's performance was deficient, *i.e.*, that it fell below an "objective standard of reasonableness" under prevailing professional norms.

*Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Second, he must establish that he was prejudiced by counsel's deficient performance, *i.e.*, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* A court need not determine whether counsel's performance was deficient if the lack of prejudice is clear. *Id.* at 697. On federal habeas, a petitioner must show that the state court applied *Strickland* to the facts of his case in an objectively unreasonable manner. *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003) (per curiam).

In rejecting this claim, the Court of Appeal did not apply *Strickland* to the facts of this case in an objectively unreasonable manner. The state court agreed with Petitioner that the prosecutor made incorrect statements during his closing statements with regards to the standard for voluntary manslaughter. *See supra* at 7. However, it found that the misstatements were sufficiently neutralized by defense counsel's corrective statements during his closing argument and the court's direction to the jury that it must follow the correct standard set forth in the jury instructions where counsel made conflicting statements. *Id.* at 8. As the state appellate court noted, the jury requested and received additional copies of the court's instructions, which suggests that it was following the instructions rather than relying on counsels' statements. *Id.* at 9. Furthermore, defense counsel did in fact object to the prosecution's misstatement of the law during closing argument, which prompted the trial judge to direct the jury to follow the standard set forth in the jury instructions. *Id.* Accordingly, it cannot be said that counsel's failure to object to the misstatements a second time was likely to have yielded a better result, and even if counsel had objected, the result of the proceeding would not have been different. *Strickland*, 466 U.S. at 697. Petitioner is not entitled to habeas relief on this claim.

    2.    <u>Trial Error in Permitting Private Readback</u>

Petitioner's last claim is that the trial court erred when it allowed the court reporter to privately readback Petitioner's testimony to the jury. Petitioner claims that this private readback violated his right to be present, his right to assistance of counsel, and his right to a public trial and procedural due process.

The Court of Appeal summarized what happened at trial with respect to this claim.

> During its deliberations, the jury requested readback of a portion of defendant's testimony relating to the events that occurred after he and Besham returned home on the night of the killing. The trial court gave counsel for both parties an opportunity to review a rough transcript of the requested testimony, and the attorneys agreed to the portions that would be included in the readback. The following morning, in accordance with the trial judge's normal practice, the court reporter entered the jury room and reread to the jury the portions of the testimony to which the parties had agreed. When the readback occurred, the judge was conducting proceedings in another matter and was not made aware until after the readback was completed that defendant had objected to the readback occurring in the jury room out of his presence and the presence of counsel. The court permitted defense counsel to put his objection on the record and apologized for the "failure of communication," but indicated that the reporter had followed standard procedures in his courtroom which it considered to be proper. The court indicated that "the rules as to readback" were that the reporter was "not to have any discussion with the jurors about the case or the testimony, that he is simply to read back the transcript upon which the parties have agreed and not to entertain any questions or any requests for additional readback, but to have the jurors put that in writing and not to permit any discussion of the case while he's in the room," and the reporter confirmed that he had followed those rules.

(Op. at 10-11.)

The Court of Appeal first denied the claim on state statutory grounds. (Op. at 11-12.) Then the state court rejected Petitioner's claim that his federal constitutional rights were violated.

> Defendant contends, however, that the error was of constitutional proportions. A defendant has a federal constitutional right, derived from the confrontation clause of the Sixth Amendment and the due process clause of the Fourteenth Amendment, to be personally present at "all critical stages of [a] criminal prosecution where his... absence might frustrate the fairness of the proceedings' [Citations.]" or where "his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.'" (U.S. Const., 6th & 14th Amends.; *People v. Bradford* (1997) 15 Cal.4th 1229, 1356-1357; *People v. McCoy* (2005) 133 Cal.App.4th 974, 981-982; see also *People v. Horton, supra*, 11 Cal.4th at pp. 1120-1121.) A defendant also has a right to have counsel present "'at every stage of a criminal proceeding where substantial rights of a criminal accused may be affected.'" (*McCoy*, at pp. 981-982.) The California Constitution creates a similar right to be present personally or with counsel at all critical stages of a criminal proceeding. (Cal. Const., art. I, §§ 16, 24.)
>
> While these rights are well recognized, the rereading of testimony is not ordinarily considered a critical stage of trial. Absent unusual circumstances, a defendant's due process and Sixth Amendment rights are not violated by his absence from a readback of testimony. (*People v. Ayala* (2000) 23 Cal.4th 225, 288.) Defendant appears to concede as much, noting that the presumption of openness under the Sixth Amendment "applies to all critical proceedings." He contends that although the California Supreme Court has repeatedly confirmed that readback is not a critical stage of trial, its decisions are distinguishable because in each case the accused or his counsel waived any right to be present. Whether holding or dictum, however, the pronouncements of the Supreme

Court, which we are bound to follow, are unambiguous. (See *Ayala*, at pp. 288-289 & fn. 8 [noting that defendant may have waived right to be present at readback but stating that "no waiver was required" because readback is not a critical stage of trial]; *People v. Cox* (2003) 30 Cal.4th 916, 963 [argument that defendant's absence from readback violated due process is "without merit"]; *People v. Horton, supra,* 11 Cal.4th at pp. 1120-1121 [no right to be present at readback].)

Defendant relies primarily on one federal decision, *Fisher v. Roe* (9th Cir. 2001) 263 F.3d 906, overruled on another ground by *Payton v. Woodford* (9th Cir. 2003) 346 F.3d 1204, 1217, footnote 18. In that case, the Ninth Circuit upheld federal habeas corpus relief for two individuals convicted of murder where the trial court had allowed readback to the jury without the knowledge of and in the absence of the accused's attorneys. (*Fisher*, at pp. 910-911, 917.) While we are not bound by this decision (see *People v. Crittenden* (1994) 9 Cal.4th 83, 120, fn. 3), we note that in all events it is distinguishable. In that case the attorneys were completely unaware of the readback and were given no opportunity to ensure that testimony of defense witnesses and cross-examination of prosecution witnesses were included in the readback or that the court reporter's notes were accurate. (*Fisher*, at p. 915.) Under those circumstances, the exclusion of the defendants and their attorneys from the entire readback process interfered with the defendants' "opportunity to defend against the charge" (*id.* at p. 914) to the point of violating their federal constitutional rights (*id.* at p. 917 [emphasizing the "fact-sensitive nature of the inquiry as to whether a defendant's rights will be adversely affected by his absence from a particular proceeding"].) In the instant case, defense counsel was given the opportunity to review the requested trial testimony and agreed to the content of the readback. The reading of the approved testimony involved no unusual circumstance that required his presence. (See *People v. Ayala, supra,* 23 Cal.4th at p. 288.)

Defendant's related contentions that readback of testimony in the closed jury room violates his right to a public trial and to procedural due process are similarly disposed of. A trial, ""'so far as the term 'public trial' is concerned, consists in the proceedings for the impanelment of the jury, the opening statements of counsel, the presentation of evidence, the arguments, the instructions to the jury and the return of the verdict.'"" but the "accused [is] not entitled to be personally present during proceedings which bear no reasonable, substantial relation to his opportunity to defend the charges against him." (*People v. Feagin* (1995) 34 Cal.App.4th 1427, 1438-1439.) As just discussed, readback of testimony is not such a proceeding. (See *Ayala, supra,* 23 Cal.4th at p. 288.) The balancing test set out in *Press-Enterprise Co. v. Superior Court of California* (1984) 464 U.S. 501, 510[,] and *Waller v. Georgia* (1984) 467 U.S. 39, 47-48[,] for determining whether a court can properly close some portion of a trial therefore does not apply, and no hearing for purposes of procedural due process was required to determine whether that test was satisfied.

(Op. at 12-14.)

The Supreme Court has recognized that "the right to personal presence at all critical stages of the trial . . . [is a] fundamental right[] of each criminal defendant." *Rushen v. Spain,* 464 U.S. 114, 117 (1983). This right derives from the Confrontation Clause of the Sixth Amendment and the Due Process Clauses of the Fifth and Fourteenth Amendments. *Campbell v.*

*Wood*, 18 F.3d 662, 671 (9th Cir. 1994) (en banc). The Confrontation Clause protects a defendant's right to face his accusers and applies to every stage of a trial. *See Illinois v. Allen*, 397 U.S. 337, 338 (1970). Due process, on the other hand, protects a defendant's right to be present "at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987); *see, e.g., United States v. Mitchell*, 502 F.3d 931, 973 (9th Cir. 2007) (en banc) (no violation of rights under Due Process Clause or Confrontation Clause where trial judge met ex parte with Marshal to discuss security concerns regarding the transfer of the case to another venue and after defendant announced his refusal to be present for the penalty phase of trial); *Sturgis v. Goldsmith*, 796 F.2d 1103, 1108 (9th Cir. 1986) (finding due process right to be present at competency hearing determining competency to stand trial).

The Ninth Circuit has held that criminal defendants have a Sixth Amendment right to be present at jury readbacks. *La Crosse v. Kernan*, 244 F.3d 702, 707-08 (9th Cir. 2001) (citing *Hegler v. Borg*, 50 F.3d 1472 (9th Cir. 1995), and *United States v. Kupau*, 781 F.2d 740 (9th Cir. 1986)). However, these cases predate AEDPA and rely on circuit rather than Supreme Court authority. *Id.* Moreover, the Supreme Court has never addressed whether readback of testimony to a jury is a critical stage of the trial triggering a criminal defendant's fundamental right to be present. *Id.* Consequently, it cannot be said that a state court's rejection of such a claim "was contrary to or an unreasonable application of clearly established federal law" under 28 U.S.C. § 2254(d)(1). *Id.*

The Ninth Circuit has limited the holding in *La Crosse* to situations where defense counsel knew about the readback and stipulated to defendant's absence. *Fisher v. Roe*, 263 F.3d 906, 916-17 (9th Cir. 2001) (distinguishing *LaCrosse*). Where neither defendant nor counsel were present and were not notified of the readback, this may be an unreasonable application of Supreme Court law that a defendant is entitled to be present at critical stages of the trial. *Id.* at 914-17. Whether readback of testimony was a critical stage of trial is a fact-sensitive inquiry and varies from case to case. *Id.* at 917-18 (affirming district court's granting habeas petition on basis of absence during readback). *But cf. United States v. Rosales-Rodriguez*, 289 F.3d 1106,

1110-11 (9th Cir. 2002) (in direct appeal case, holding that the district court's unsolicited note to the jury about starting deliberations over with an alternate juror if the jury could not reach a verdict by the end of the day was a supplemental jury instruction constituting a critical stage of the proceeding entitling defendant or his counsel to be present).

The state appellate court properly distinguished *Fisher* from the case at bar in rejecting Petitioner's claim based thereon. In *Fisher*, readbacks were conducted without the knowledge of defendants or their counsel. Here, counsel for both parties had notice of the readback and were given an opportunity to review a rough transcript of the requested testimony before they agreed to the portions that would be included in the readback. Accordingly, unlike in *Fisher*, Petitioner and his defense counsel had an opportunity to control the parameters of the requested testimony and "'to defend against the charge.'" See *supra* at 12.

Even if we assume that Petitioner's right to be present was violated, relief is warranted only if such a trial error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). While in *Fisher* there was doubt as to whether proper procedures were followed, here the record contains the "veteran" court reporter's testimony that he followed the proper procedures and rules for readback, i.e., "not to have any discussion with the jurors about the case or the testimony, that he is simply to read back the transcript upon which the parties have agreed and not to entertain any questions or any requests for additional readback, but to have the jurors put that in writing and not to permit any discussion of the case while he's in the room." See *supra* at 11. Petitioner presents no evidence suggesting that his presence, or that of his counsel, would have made any difference in the readback, and there is nothing in the record showing that anything unusual occurred during the readback to indicate that the error substantially influenced the jury's decision. *O'Neal v. McAninch*, 513 U.S. 432, 436-37 (1995).

Petitioner's claim that the private readback violated his right to a public trial and that the trial court violated procedural due process by failing to hold a hearing thereon is also meritless. There must be an affirmative act by the trial court meant to exclude persons from the courtroom for there to be a denial of a defendant's Sixth Amendment right to a public trial. *United States v.*

*Shryock*, 342 F.3d 948, 977 (9th Cir. 2003). The right to a public trial is only implicated by a closure of the trial. *See id.* (fact that courtroom had only limited seating for visitors did not amount to a closure of the trial). Petitioner's trial was never closed to the public, and jury deliberations are intended and meant to be conducted in private. Accordingly, there was no need for the trial court to hold a hearing on the appropriateness of a private reading during jury deliberations. Nevertheless, even assuming trial error occurred, there is no indication that the jury would have reached a different decision had the readback been conducted in open court. As discussed above, the seasoned court reporter testified that he followed proper procedure and nothing inappropriate or unusual occurred during the readback.

Based on these facts, it cannot be said that the California Court of Appeal's rejection of this claim was contrary to or an unreasonable application of clearly established Supreme Court precedent. 28 U.S.C. § 2254(d)(1).

## CONCLUSION

For the reasons set forth above, the petition for writ of habeas corpus is DENIED.

The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition to grant or deny a certificate of appealability ("COA") in its ruling. *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254. Petitioner has not shown "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Accordingly, a COA is DENIED.

The Clerk shall close the file.

IT IS SO ORDERED.

DATED: 7/16/12

LUCY H. KOH
United States District Judge

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

STEVEN DOUGLAS BURR,

    Plaintiff,

v.

FRANK CHAVEZ et al,

    Defendant.
_____/

Case Number: CV10-05935 LHK

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on July 16, 2012, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Steven Douglas Burr G-37732
Sierra Conservation Center
5150 O'Byrnes Ferry Road
Jamestown, CA 95327

Dated: July 16, 2012

Richard W. Wieking, Clerk
/s/ By: Elizabeth Garcia, Deputy Clerk